Judge RYAN delivered the opinion of the Court.
A general court-martial, composed of military judge alone, convicted Appellant, contrary to his pleas, of rape of a child under sixteen, sodomy of a child under sixteen, two specifications of indecent liberties, indecent acts, and wrongful communication of a threat, in violation of Articles 120, 125, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 925, 934 (2000). The sentence adjudged by the court-martial and approved by the convening authority included a dishonorable discharge, reduction to the lowest enlisted grade, forfeiture of all pay and allowances, and confinement for twenty-five years. The United States Army Court of Criminal Appeals summarily affirmed the findings and sentence. United States v. Ortiz, No. ARMY 20040672 (A.Ct. Crim.App. Mar. 23, 2007) (unpublished). On Appellant’s petition, we granted review.[1]
I. Facts
Appellant was accused of raping, sodomizing, and subsequently threatening the daughter of a family friend and neighbor. The victim, BP, was nine years old when the crimes were committed. At the time of trial she was eleven.
BP was the first witness called by the Government at trial. It is apparent from the record that she had considerable difficulty testifying. Despite efforts by the trial counsel, whom the military judge gave leave to ask leading questions, BP’s answers were largely unresponsive and inaudible.
The military judge allowed BP to take a break in order to “get her composure.” During the break, the military judge conducted a brief Rule for Courts-Martial (R.C.M.) 802 session. The parties agreed that BP’s Victim Witness Advocate would move from the gallery, where she had been sitting at the outset of BP’s testimony, to the panel box, so that BP could see her more easily and answer questions more directly. BP continued to be unresponsive.
Trial counsel then moved to admit as exhibits two anatomically correct dolls to assist in BP’s testimony. Defense counsel lodged an objection, at which time BP told defense counsel to “shut up.” The military judge instructed her to treat everyone in the courtroom with respect.
At this point, trial counsel moved to clear the gallery:
TC: Your honor, at this time the government would move the court to clear the gallery of spectators. The reason for that is that it’s apparent from [BP’s] testimony that she’s having *336 difficulty testifying. I believe that’s resulting from some embarrassment. And we would ask that the court exclude the members of the gallery from the gallery of the courtroom.
MJ: What’s your authority?
TC: In the Manual for Courts-Martial 2002 Edition, in the discussion section under Rule 806 where it discusses the Rule for 806 about a public trial, it says that “occasionally defense and prosecution may agree and request a closed session to enable a witness to testify without fear of intimidation or acute embarrassment or will testify about a matter, which while not classified as of a sensitive or private nature and that closure may be appropriate in such cases.”
MJ: Does defense have an objection to clearing the gallery for [BP’s] testimony?
DC: Judge, we would note our objection to excluding the people from the gallery. Number one, it’s a public trial. Number two, as I read the paragraph that the court invited to my attention, it says, “occasionally defense and prosecution may agree to request a closed session to enable a witness to testify without fear of intimidation or acute embarrassment, etc.” I don’t know that there’s been any intimidation, that’s for sure. Secondly, judge, as far as the gallery is concerned, the young lady had had her back to the gallery because of the positioning of the microphone. She’s primarily—
MJ: Well, I agree, but — but I think when they’re — I think the intent there is if they are here and can hear, that it would be — that it is — (pause)—that it would be difficult.
TC: Your honor, the government also wants to ask — it’s not only that intimidation or embarrassment. It also goes on to say in the discussion “if the matters are of a sensitive or a private nature” and the government has good faith belief to believe that [BP] could testify to matters that are of a sensitive and private matter to her.[2]
In response to the motion and argument, the military judge stated that “the question seems to be ... whether or not she’s going to be capable of doing it — whether she would be more capable of doing it or more able to do it if the gallery were briefly excluded.” The military judge then recessed the court for approximately ten minutes in order to research and consider the motion.
Upon calling the court to order, the military judge ordered a chair be placed in the well of the court, directly in front of her bench, and proceeded to question BP.
MJ: Okay. Now you’ve said before you’re 11?
WIT: Yes.
*337 MJ: Okay, good. You’re going to become a professional at this before too long. (Pause.) Are you nervous?
WIT: Yes.
MJ: Why are you nervous?
WIT: Because.
MJ: Is this hard?
WIT: Yes.
MJ: Why is it hard?
WIT: Because somebody’s in here.
MJ: Because people are here?
WIT: No, because — yes, and to somebody.
MJ: Because somebody is here.
WIT: Yes, and because people are here.
MJ: Okay.
MJ: Okay, you said it was hard because there are people here?
WIT: (Affirmative nod.)
MJ: When you get nervous, do you tend to talk real low like you’re doing now?
WIT: I guess.
MJ: Well, I’m just thinking that if you’re a cheerleader you have to be able to yell and scream, right?
WIT: Yes.
MJ: Okay. So are you talking real low and scrunching down in your seat because this is a hard thing to talk about?
WIT: Yes.
MJ: And because there are a lot of adults here and you’re the only kid?
WIT: No.
MJ: No?
Wit: No.
MJ: Are you upset to be here today?
WIT: No.
MJ: You’re not upset to be here?
WIT: (Negative head shake.)
MJ: Okay. Even though your chair is faced towards me, do you know— are you aware — is it problematic that there are people in the — back in the gallery?
WIT: What do you mean?
MJ: (Pause.) Is it difficult to come in and talk to all of us today?
WIT: Yes.
MJ: (Pause.) And sometimes it’s kind of hard because even though you— you’re not looking at people, you know that they’re there watching you.
WIT: Yes.
MJ: (Pause.) [BP], what’s happening here today is real serious. Have they talked to you about that?
WIT: Uh-huh. What people talked?
MJ: Well, have — when you were interviewed by the counselors in this case, did they talk to you about the fact this is important?
WIT: Yes.
MJ: Okay. And I know it’s hard. It’s particularly hard when you’re only 11 years old. Would it be a little easier if there weren’t quite so many people here?
WIT: Kind of.
MJ: Do you think that you would be able to answer the questions if there weren’t quite so many people here?
WIT: Yes.
MJ: You think you could?
WIT: (Affirmative nod.)
MJ: You’re nodding your head. Is that a yes?
WIT: Yes.
Following this colloquy, and without further discussion or explanation, the military judge ordered the courtroom cleared of spectators and the doors locked. The record does not reflect how many spectators were in attendance, or whether any of them were or were not friends or family of Appellant.
After the courtroom was cleared trial counsel recommenced direct examination of BP and elicited testimony that Appellant raped, sodomized, and threatened her. BP’s testimony, and the court closure, lasted the majority of the first day of a two-day trial. The remaining Government witnesses, excluding one witness whose testimony was ultimately disallowed by the military judge, testified for a total period of approximately two hours, during which time the courtroom was open to the public.
*338 II. Analysis
“In all criminal prosecutions, the accused shall enjoy the right to ... a public trial.” U.S. Const, amend. VI. A public trial “ensures] that judge and prosecutor carry out their duties responsibly ... and discourages perjury.” Waller v. Georgia, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).
Yet, as interpreted by the Supreme Court, the right to a public trial is not absolute. Id. at 45, 104 S.Ct. 2210 (stating that the “Court has made clear that the right to an open trial may give way in certain cases to other rights or interests”); see also United States v. Hershey, 20 M.J. 433, 436 (C.M.A. 1985) (stating the same). However, there is a strong presumption in favor of a public trial, grounded in the belief that it is critical to affording an accused a fair trial, as “ ‘judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings.’ ” Waller, 467 U.S. at 46 n. 4, 104 S.Ct. 2210 (quoting Estes v. Texas, 381 U.S. 532, 588, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring)). This presumption is overcome only where “the balance of interests ... [is] struck with special care.” Id. at 45, 104 S.Ct. 2210. In striking this balance, the Supreme Court has looked to its First Amendment jurisprudence regarding the press and public’s right to attend criminal trials and incorporated the test used there in the Sixth Amendment context. Id. at 45-46,104 S.Ct. 2210.
Recognizing the importance of the right, not only to an accused, but to the public and the integrity of the criminal process, prior to closing a trial we require that:
[(1)] the party seeking closure must advance an overriding interest that is likely to be prejudiced; [(2)] the closure must be narrowly tailored to protect that interest; [(3)] the trial court must consider reasonable alternatives to closure; and [(4) the trial court] must make adequate findings supporting the closure to aid in review.
Hershey, 20 M.J. at 436 (citing Press-Enterprise Co. v. Superior Court (Press-Enterprise I), 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); and Waller, 467 U.S. at 46,104 S.Ct. 2210).
The question before us is whether the military judge abused her discretion in closing the courtroom during BP’s testimony. See United States v. Short, 41 M.J. 42, 44 (C.M.A.1994) (reviewing a ruling under R. C.M. 806(b) for an abuse of discretion); United States v. Travers, 25 M.J. 61, 62 (C.M.A.1987) (applying an abuse of discretion standard and stating that “[t]he question of whether ‘an overriding interest’ [necessitating closure] exists lies in the sound discretion of the military judge”); United States v. Farmer, 32 F.3d 369, 371-72 (8th Cir.1994) (reviewing a decision to temporarily close a trial for an abuse of discretion). “A military judge abuses his discretion when ... [she] improperly applies the law.” United States v. Roberts, 59 M.J. 323, 326 (C.A.A.F.2004). Here, the only question is whether the military judge correctly applied the law. The military judge in this case failed to correctly apply the legal test necessary to overcome the presumption in favor of a public trial. Consequently, the denial of the right to a public trial was an abuse of discretion.
The military judge did not even identify the relevant factors to consider or articulate the reason for her decision to clear the courtroom, let alone make findings. For that reason alone her decision was not in conformity with the law. See Waller, 467 U.S. at 45, 104 S.Ct. 2210 (stating that a trial judge must make “ ‘findings specific enough that a reviewing court can determine whether the closure order was properly entered’ ” (quoting Press-Enterprise I, 464 U.S. at 510, 104 S. Ct. 819)). On the other hand, the record illustrates both a practical reason for closure — the child witness could not or would not testify before the courtroom was closed— and that at least some alternatives less restrictive than closure were attempted.
The real question, therefore, is whether failure to meet the test articulated by the Supreme Court in Waller makes the deprivation of the Sixth Amendment right to a public trial erroneous. On the bare record before us, we hold that it does.
This is an unfortunate case. The articulated interest proposed by the Government counsel was ambiguous, at best. And the military judge failed to make any findings, let alone adequate findings, supporting elo *339 sure to aid in review. It is unfortunate because, based on the record before us, the military judge could well have made findings supporting her decision, and in the process perhaps better articulated the Government’s interest in the closure. With this lacuna, we need not address the question whether the closure was narrowly tailored to protect the overriding interest or whether reasonable alternatives to closure were considered, since the military judge did not inform us of the basis for her decision.
A. The Articulation of an Overriding Interest
In order to overcome the strong presumption in favor of the public trial right, the party seeking closure must articulate and advance an overriding interest that is likely to be prejudiced. No one questions that if trial counsel had articulated that closure was necessary to protect the physical and psychological welfare of BP, the minor victim, an overriding interest would have been advanced. See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (stating that “safeguarding the physical and psychological well-being of a minor — is a compelling” interest) (footnote omitted); United States v. Galloway, 937 F.2d 542, 546 (10th Cir.1991) (finding a “substantial or compelling interest in protecting young witnesses who are called to testify in cases involving allegations of sexual abuse”). But that was not the interest advanced in this case.
Rather, the trial counsel specifically requested closure on the grounds that BP was having trouble testifying, possibly because she was embarrassed, and a general observation that the testimony was of “a sensitive or private nature.” Suggesting that a witness’s difficulty testifying based on possible embarrassment, or the private or sensitive nature of the testimony alone is sufficient to constitute the “compelling interest” that is “likely to be prejudiced” necessary to override an accused’s right to a public trial is inarticulate at best.[3] See Hershey, 20 M.J. at 436 (stating that “[wjhile it may be permissible under certain circumstances to exclude spectators during the testimony of a victim of tender years, that must be decided on a ease-by-case basis and not based on the mere utterance of the word ‘embarrassment’ ”).
Not only are we aware of no case where such a proffer was deemed sufficient, it seems contrary to the Supreme Court’s analysis in Globe Newspaper, which appeared to reject generalized assertions of closure based on the possibility of embarrassment or the sensitive nature of the testimony. See 457 U.S. at 606-09,102 S.Ct. 2613.
B. Adequate Findings on the Record
Even assuming the trial counsel’s asserted interest was sufficient as articulated, Hershey requires the military judge to consider the interest, make a determination on a case-by-case basis, and make adequate findings to support appellate review. 20 M.J. at 436.
In making that determination, a military judge’s findings should show that she considered factors such as “the minor victim’s age, psychological maturity and understanding, the nature of the crime, the desires of the victim, and the interests of parents and relatives.” Globe Newspaper, 457 U.S. at 608, 102 S.Ct. 2613 (footnote omitted). In this case, the military judge asked BP several leading questions regarding her age, whether she had discussed the necessity of her testimony with counselors, the reasons for her difficulties testifying, and finally asked her if closing the courtroom would mitigate those difficulties.
The answers elicited in response to these questions may have formed the basis for a determination that closure was necessitated in this case to protect the well-being of a minor victim, and adequate findings for appellate review. But the military judge never affirmatively, either orally or in a written addendum to the record, articulated findings as to why she deemed closure to be necessary; she simply ordered the courtroom closed. While we do not believe the Sixth *340 Amendment dictates a formalistic approach as to the manner in which a military judge delivers her findings, this Court, following the lead of the United States Supreme Court, requires that a military judge make some findings from which an appellate court can assess whether the decision to close the courtroom was within the military judge’s discretion. Press-Enterprise Co. v. Superior Court (Press-Enterprise II), 478 U.S. 1, 13-14, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986); Waller, 467 U.S. at 47, 104 S.Ct. 2210; Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. 819; Hershey, 20 M.J. at 436.
On the current state of the record we have no way of knowing the military judge’s reasons or reasoning for closing the courtroom. This makes it impossible to determine whether the military judge properly balanced the inadequate interest asserted by the Government — possible embarrassment to BP— against the accused’s right to public trial, or substituted another interest such as the psychological well-being of the child in place of the one inartfully asserted by the Government. See Press-Enterprise II, 478 U.S. at 13-14, 106 S.Ct. 2735 (“[Pjroceedings cannot be closed unless specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.”) (citations and quotation marks omitted); Waller, 467 U.S. at 49 n. 8, 104 S.Ct. 2210 (rejecting appellate court’s post hoc assertion that the trial court properly balanced the interests where findings were inadequate); English v. Artuz, 164 F.3d 105, 109-10 (2d Cir.1998) (holding that the absence of “meaningful findings” violated the appellant’s right to a public trial); Guzman v. Scully, 80 F.3d 772, 776 (2d Cir.1996) (stating the same).
C. Erroneous Deprivation of the Right to Public Trial
The Government argues that none of the above constitutes an erroneous deprivation of Appellant’s Sixth Amendment right to a public trial either because it was not a true closure or because this Court can, post hoc, discern sufficient information from the record to perform the test laid out in Waller and Hershey on our own. We disagree.
1. Appellant’s Trial Was Completely Closed
Where some spectators are required to leave, and some spectators can or do remain, the Constitution’s public trial guarantee, which ensures that participants perform their duties “more responsibly” and discourages perjury, see Waller, 467 U.S. at 46 & n. 4, 104 S.Ct. 2210 (citation and quotation marks omitted), is “only moderately burdened ... as certain spectators remain and are able to subject the proceedings to some degree of public scrutiny.” Judd v. Haley, 250 F.3d 1308, 1315 (11th Cir.2001). A partial closure that allows some, but not all, spectators to remain thus may not raise precisely the same concerns articulated in Waller and Press-Enterprise I. See, e.g., Garcia v. Bertsch, 470 F.3d 748, 753 (8th Cir.2006) (allowing a laxer standard “because a partial closure does not ‘implicate the same secrecy and fairness concerns that a total closure does’” (quoting Farmer, 32 F.3d at 371)); Nieto v. Sullivan, 879 F.2d 743, 753 (10th Cir.1989) (using “a less stringent test of a ‘substantial reason’ where partial closures are held necessary”); Douglas v. Wain-might, 714 F.2d 1532, 1540 (11th Cir.1983) (holding that “where neither all members of the public nor the press are excluded, the ‘public’ nature of the proceedings may be retained sufficiently so that a lesser justification for the partial closure will suffice to avoid constitutional deprivation”).
Consequently, several circuits have found no erroneous deprivation of the right to a public trial despite limited findings or the absence of findings in the context of a “partial closure.” See, e.g., United States v. Sherlock, 962 F.2d 1349, 1356-57 (9th Cir. 1989) (holding that limited findings were acceptable in a partial closure case). The parties have cited no case where a more lax approach to the absence of findings was adopted after the court found a complete, albeit temporary, closure of the courtroom.[4]
*341 Labeling a closure as “complete” or “partial” is a qualitative, not temporal, question. While the Government argues that the closure in this case was partial because it did not encompass the entirety of the proceedings, we think the appropriate analysis begins by asking exactly who was barred from the court. Closures have typically been described as “partial” when select spectators or members of the press were barred from the courtroom, but others were allowed to remain. See, e.g., United States v. Osborne, 68 F.3d 94, 99 (5th Cir.1995) (exclusion of codefendant’s sister and “new spectators” during testimony of one witness upheld); Farmer, 32 F.3d at 371-72 (exclusion of all spectators except victim’s family while victim testified upheld); Kuhlmann, 977 F.2d at 76-78 (exclusion of defendant’s common law wife, his common law wife’s sister and his cousin during one witness’s testimony upheld); Nieto, 879 F.2d at 753-54 (exclusion of defendant’s sisters and other unspecified relatives during one witness’s testimony upheld); Sherlock, 962 F.2d at 1356-59 (exclusion of defendants’ unspecified family members during victim’s testimony upheld). Conversely, the temporary nature of a closure has not prevented courts from describing it as “complete.” English, 164 F.3d at 110 (complete closure to seal the court during one witness’s testimony). In this ease, the courtroom was cleared of all spectators during the vast majority of BP’s testimony.
Going beyond the question of who was barred, the United States Court of Appeals for the Second Circuit succinctly articulated other substantive factors to be considered in determining whether a closure is “broad or narrow,” “complete or partial”:
[It] depends on a number of factors, including its duration, whether the public can learn (through transcripts, for example) what transpired while the trial was closed, whether the evidence presented during the courtroom closure was essential, or whether it was merely cumulative or ancillary, and whether selected members of the public were barred from the courtroom, or whether all spectators were precluded from observing the proceedings.
Bowden v. Keane, 237 F.3d 125, 129-30 (2d Cir.2001) (citations omitted).
In this case the court was closed to the public during the substantive testimony of the key Government witness, which was essential to, and comprised the bulk of, the Government’s ease. All spectators were barred from observing the crux of the proceedings against Appellant.
It is true that this Court described a closure during the testimony of the key government witness as partial after considering the short duration of the closure, but notable to the decision in that case was that, “[m]ore importantly, it appears that the only person present in the courtroom other than the accused and court personnel when trial counsel made his exclusionary motion was appellant’s escort. The two people asked to leave the courtroom, then, were not there as spectators, but to perform a governmental function.” Hershey, 20 M.J. at 437.
In this case, the record indicates that the courtroom was completely closed to spectators. The military judge “cleared the gallery,” creating a strong inference there were spectators to clear, and locked the doors during the entirety of the substantive testimony of the Government’s critical witness— the victim. Nothing in the record indicates whether the friends or family of the accused or the witness were present. See In re Oliver, 333 U.S. 257, 272, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (noting that “an accused is at the very least entitled to have his friends, relatives and counsel present”). And while the military judge did suggest she might reopen the courtroom during BP’s testimony, *342 United States v. Ortiz, 66 M.J. at 344 (C.A.A.F.2008) (Stucky, J., dissenting), that never occurred. The closure in this case was a complete closure for purposes of the Sixth Amendment, albeit less than complete in a temporal sense.
2. This Court May Not Make Post Hoc Findings
The Government asks us to infer and glean from the record findings that were not placed there by the military judge. We decline to engage in post hoc reconstruction of facts and findings that could have been made at trial, but were not. The trial procedure to address this Sixth Amendment right requires, inter alia, trial counsel to advance a compelling interest and the military judge to carefully balance, on the record, that interest against the accused’s Sixth Amendment right. The military judge was required to place her analysis on the record sufficient to demonstrate that this balancing occurred. That did not happen.
Moreover, the Government’s assertion misapprehends the test articulated by the Supreme Court. Waller, 467 U.S. at 49 n. 8, 104 S.Ct. 2210 (rejecting the Georgia Supreme Court’s post hoc balancing analysis as unable to satisfy the Press-Enterprise I standard).[5] The question is not whether an appellate court can supply a cogent reason why it was acceptable to deprive an accused of the constitutional right to a public trial. Rather, the question is whether the military judge identified the competing interests and balanced them in a given case. The mind of the military judge cannot be inferred from the record, absent something in the record reflecting the military judge’s analysis.
Finally, under the circumstances of this case, Appellee’s argument ignores that this Court may only take action with respect to matters of law. Article 67(c), UCMJ, 10 U.S.C. § 867(c) (2000). Therefore, we reject the Government’s request that we selectively search the record and make factual findings supporting the military judge’s decision to close the courtroom.
D. Remedy
In this case, the record does not support a conclusion that the Waller/Hershey balance was considered or struck by the military judge. Consequently, the presumption in favor of the right to a public trial was not overcome at trial, and the complete deprivation of the right was erroneous.
An erroneous deprivation of the right to a public trial is structural error, which requires this Court to overturn Appellant’s conviction without a harmlessness analysis. Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (noting that denial of the right to public trial is a structural error because it is a “constitutional deprivation! ] ... affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself’ (citing Waller, 467 U.S. at 49 n. 9, 104 S.Ct. 2210)).
III. Decision
The decision of the United States Army Court of Criminal Appeals is reversed. The findings and sentence are set aside, and the record of trial is returned to the Judge Advocate General of the Army. A rehearing is authorized.

. We granted review of:
WHETHER APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A PUBLIC TRIAL WHEN THE MILITARY JUDGE EXCLUDED THE PUBLIC FROM THE COURTROOM WHEN THE VICTIM, BP, TESTIFIED ON THE MERITS.
65 M.J. 335 (C.A.A.F.2007).

. This discussion highlights the trial counsel and military judge’s apparent misunderstanding of the treatment by the 2002 Manual for Courts-Martial, United States (2002 ed.) of the public trial right in R.C.M. 806, which provided in pertinent part: "Except as otherwise provided in this rule, courts-martial shall be open to the public.” (emphasis added). Further, "a session may be closed over the objection of the accused only when expressly authorized by another provision of this Manual.” R.C.M. 806(b) (emphasis added). The defense did object, and none of the provisions that expressly authorized closure, Military Rule of Evidence (M.R.E.) 412(c) (addressing victim's sexual predisposition), M.R.E. 505(i) and (j) (addressing classified information), and M.R.E. 506(i) (addressing non-classified but sensitive government information), pertained. R.C.M. 806(b) Discussion. Thus, while the Discussion does recognize that “the defense and prosecution may agree to request a closed session to enable a witness to testify without fear of intimidation or acute embarrassment, or to testify about a matter which, while not classified, is of a sensitive or private nature,” id., the defense counsel objected to the closure in this case. Because the construction and application of R.C.M. 806 was not briefed by the parties and is not necessary to the disposition of the granted issues, we need not and do not decide whether failure to comply with the 2002 version of R.C.M. 806 alone would be tested for prejudice, or deemed structural error.

. We save for another day the question whether the Government's anemic articulation of an overriding interest could have been resurrected by more specific findings on the part of the military judge.

. We note that one circuit has, in the course of considering a habeas corpus petition based on an allegation of ineffective assistance of counsel in a state trial, determined that it was not an unrea *341 sonable application of federal law to find no ineffective assistance of counsel for failing to raise a erroneous deprivation of the right to a public trial on direct review where specific findings were not made by the judge, but the record did not show that the judge had not made a considered determination to close the court. Bell v. Jarvis, 236 F.3d 149, 171-72 (4th Cir. 2000) (stating "[w]e find no basis upon which to conclude that the trial judge failed to carefully consider the individual facts of this case before making his decision, or that he otherwise shirked his duty in this regard”). Given the standard of review applied in collateral challenges to state court decisions, we think it is not persuasive authority for a case on direct review.

. The dissent appears to embrace the Government’s suggestion that this Court can fill the void in the record via post hoc rationalization that the military judge did engage in the required balancing test. However, there is simply no statement by the military judge identifying or suggesting she balanced the factors outlined in Waller and Hershey, and that "assertion finds little or no support in the record.” Waller, 467 U.S. at 49 n. 8, 104 S.Ct. 2210.